**PLEASANTVIEW CONVALESCENT AND NURSING CENTER, INC., an Illinois Corporation, Plaintiff,**

v.

**Caspar W. WEINBERGER, Secretary of Health, Education, and Welfare of the United States, and Aetna Life and Casualty Co., Defendants.**

**No. 74 C 1291.**

United States District Court, N. D. Illinois, E. D.

March 31, 1975.

---

William E. Borenstein, Borenstein & Silverman, Norman L. Silverman, Lincolnwood, Ill., Addis E. Hull, Richard C. Bollow, Jenner & Block, Chicago, Ill., for plaintiff.

James R. Thompson, U. S. Atty., Jack M. Wesoky, Asst. U. S. Atty., for defendants.

## MEMORANDUM OPINION

WILL, District Judge.

The plaintiff, Pleasantview Convalescent and Nursing Center, Inc. (Pleasantview), a provider of services under the Medicare Program, 42 U.S.C. § 1395cc, brings this action to recover approximately $58,000 which it claims was wrongfully withheld by its fiscal intermediary, Aetna Life and Casualty Company (Aetna). Pleasantview has been a provider of Medicare services since 1968, and contends that it has at all times operated its facility in strict compliance with the rules and regulations governing the Medicare program, as well as those promulgated by the State of Illinois. In accordance with the Medicare program, the plaintiff was entitled to be reim-

bursed by the fiscal intermediary, Aetna, for the reasonable costs of the services furnished Medicare beneficiaries, 42 U.S.C. § 1395f, and in fact received from Aetna its actual costs expended in the years 1969 and 1970.

On May 26, 1972, plaintiff provider filed with Aetna a cost report covering the period January 1, 1971 to December 31, 1971, for settlement of costs of services rendered to Medicare beneficiaries. This cost report was desk audited and at a later date a complete audit was conducted by the fiscal intermediary's own staff, which showed, after minor adjustments, that the routine in-patient cost for Medicare beneficiaries was $182,298.00, or $102.53 per Medicare in-patient day. The intermediary, after audit, determined that these costs were unreasonable, by reason of plaintiff's failure to properly utilize the prudent buyer concept as set forth in the Bureau of Health Insurance's Provider Reimbursement Manual Section 2103. Aetna found that the reasons for such high costs were extremely low occupancy and the maintaining of separate nursing staffs for two distinct parts of plaintiff's facility. After comparing the plaintiff with like facilities in the area, Aetna concluded that the plaintiff's actual costs were not totally reimbursable, and reduced the reimbursement to $124,064.00, or $69.78 per in-patient day.

The plaintiff, dissatisfied with Aetna's determination, requested a hearing before a Provider Appeals Officer pursuant to 20 C.F.R. § 490ff. The hearing was conducted on March 27, 1973, by Hans A. Pakler, a Provider Appeals Officer within the Medicare Administration Section of Aetna.

On the basis of presentations and responses to questions during the hearing, and a review of pertinent documents, the Hearing Officer concluded in a written decision issued June 15, 1973, that, although the intermediary had improperly relied upon the "prudent buyer" concept as a basis for withholding payments to the provider, the disallowance was justified under the reasonable cost principle set forth in 20 C.F.R. § 405.451. Pakler pointed out that the prudent buyer concept only applied to the purchase of goods and services, and that the intermediary had made no showing that the plaintiff had paid excessive amounts for goods and services.

The reasonable cost principle, on the other hand, contemplates reimbursement of the provider's actual costs, even if they are at variance with comparable institutions, unless they "are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors." § 405.-451(c)(2). The regulations also provide for limitations on "amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services) . . . ." § 405.451(c)(3).

Taking into account these reasonable cost proscriptions, Pakler found that the costs incurred by Pleasantview relating to nursing staff and occupancy rate were controllable; that the question of whether it operated as one or more distinct parts was not material; that the Pleasantview per diem cost of $102.53 was substantially higher than the comparative group average of similar providers in the area of $19.59. Accordingly, he found both that this met the exception to reimbursement provided by § 405.451(c)(2) and that the services rendered were significantly more expensive than those considered necessary for the provision of needed health care services in violation of § 405.451(c)(3). Based upon the foregoing, Pakler upheld the intermediary's determination that $68.78 per diem represented reasonable reimbursable costs.

Taking exception to the Hearing Officer's decision, the plaintiff filed the instant suit to recover the $58,000, charg-

ing that Pakler's denial of payment of actual costs was arbitrary, capricious, and unsupported by the administrative record. The plaintiff argues that the Hearing Officer erroneously and illegally concluded both that the plaintiff's costs were controllable, and that the plaintiff's operation was comparable to other institutions in the area which did not have distinct parts. In support, the plaintiff offers the following evidence from the record:

(1) Plaintiff provider operated two certified "distinct parts" sanctioned by the Bureau of Health Insurance of the Social Security Administration in a letter dated 9/29/68, (Defendant's Exhibit 4).

(2) That the plaintiff provider operated his facility based upon a theory that the environment is of primary importance to the rapid recovery of a patient, thereby separating patients more in need of care on the second floor of its facility and maintaining a distinct part on each floor (hearing record, Mr. Borenstein, at p. 75).

(3) That in 1969, 1970 and 1971, plaintiff provider was required under existing State of Illinois regulations to maintain two separate nursing staffs with a registered nurse on duty 24 hours a day thereby doubling the initial existing costs related to a nursing staff prior to the entry of any Medicare beneficiaries into the distinct part (hearing record, Mr. Keener, at p. 114).

(4) That the plaintiff provider operated with the minimum number of registered nurses or licensed practical nurses required by the State of Illinois (hearing record, Mr. Clark, at p. 109).

(5) That the plaintiff provider had to be ready, willing and able to provide for Medicare patients at all times.

(6) That the plaintiff provider was required by law to designate any change in his certified area in 1971 before the beginning of the calendar year 1971 and could not reduce his number of certified beds at any time during 1971 in an attempt to reduce his costs (hearing record, Mr. Keener, at p. 54).

(7) That the only comparable type of facility to the plaintiff provider would be a facility that operated with two distinct parts and accepted only Medicare and private patients (hearing record, Mr. Geiser, at p. 79).

We do not find that these factors establish, as plaintiff suggests, that its actual 1971 costs were beyond its control, or that other local institutions providing equivalent Medicare Services were not properly comparable. For the reasons set forth hereinafter, we find that, on the cross motions for summary judgment, judgment should be entered in the defendants' favor.

The plaintiff contends that, once the calendar year 1971 began, it was locked into the distinct part set-up, and thus, even though it was faced with inordinate costs, it was powerless to rectify the situation. Since it allegedly instituted the distinct part system to provide better service, and it complied with all controlling state and federal regulations, it asserts that it should not be penalized by the resulting low occupancy-high cost situation.

The plaintiff's argument either overlooks or purposely avoids the fact that, prior to January 1971, it could have terminated the distinct part operation as economically unfeasible and instituted a single level of care for its patients. To the extent that the plaintiff could have, and indeed, should have changed its operations, the resulting inordinate costs were avoidable and thus controllable. The plaintiff's track record of declining occupancy rates of only 57.1% for 1969 and 35.2% for 1970 should have reflected the need to revise its arrangements. It may be true that the plaintiff was un-

aware of the actual very low 1970 year-end occupancy figure of 35.2% until after the January 1971 cut-off date for changing operations, but the multitude of empty beds was certainly apparent throughout the year and a cost conscious and prudent businessman would have noted the need for revision. Failure to heed the economic signals merely reflects bad business judgment on the part of the plaintiff in this case. Since the Medicare program was not intended as a guarantee against provider ineptitude, or to reimburse what amounts to a luxury operation, the plaintiff is not, as it suggests, entitled to full payment of all actual costs as a matter of law.

We agree with the Hearing Officer that "[a]pproval of a distinct part signifies a determination that the distinct part meets the requirements established for a distinct part, and is not an approval or disapproval of costs resulting from operation of a distinct part or distinct parts. To reason otherwise would mean that the Bureau of Health Insurance has assumed responsibility for the operation of all distinct parts they have approved." This is clearly not the case. Were we to accept the plaintiff's theory, there appears to be no point at which low occupancy would reflect unreasonable costs, but rather, as soon as the calendar year began, the provider would be entitled to full recoupment of all expenses regardless of patient population. Such an absurd result is obviously not within the contemplation of the Medicare program, and reflects the same suspect business acumen which apparently led to the continuance of the distinct part set-up.

■ Nor may the plaintiff seek justification by relying upon the government's alleged endorsement of distinct parts as a preferred method of dealing with extended health care problems. Without passing on the effectiveness of Pleasantview's approach, either in theory or practice, it is noteworthy that the plaintiff was prompted to set up distinct sections, at least in part, by the fiscal advantages of such an operation. As ex-

pressed in the record by Sidney Borenstein, Administrator of the plaintiff:

What it did say and what everybody has expressed is the fact for you to better recover your costs, they recommend that you go to a distinct part. This was the intent of the program. That's why they certified distinct part, not for the reason that you expressed at all.
* * *

May I read ECF Number 114, dated October 4, 1968?

"Perhaps the most effective way to meet most of the requirements and to achieve maximum reimbursement is to certify portion of your institution as a distinct part."

The record is confused as to whether the actual separation of patients was based upon their source of payment, their level of needed care, or both. If the distinct parts were in fact broken down by Medicare-Non-Medicare patients, as opposed to senility-non-senility patients, this significantly diminishes plaintiff's professed altruism as the primary basis for its distinct part decision, and instead frames plaintiff's motivation much more in economic terms. Regardless of the actual placement of patients, the fact remains that Pleasantview employed four separate nursing staffs, one of which was responsible for only nine beds, and based upon the 1971 occupancy rate for Medicare patients, of 16%, this particular nursing staff cared for, on the average, only one patient. Such an extravagant and wasteful situation only further points out plaintiff's ineptitude in persisting in its distinct part operation. The plaintiff simply made a very poor business decision, regardless of the theoretical virtues of the distinct part system.

■ We also find little merit in the plaintiff's argument that merely because the intermediary paid all actual costs of plaintiff's distinct part operation in 1969 and 1970, it should continue that policy for 1971. The plaintiff's costs

were not as excessive and out of line in the prior years, and it does not follow that these more reasonable payouts established a continuing obligation to make future reimbursements for actual expenses no matter how unreasonable. Each year's costs must be independently considered, and as § 405.451(c)(2) clearly provides, if a given year's costs are out of line with comparable institutions, the provider will not be totally reimbursed for its actual costs. To attempt to justify extravagence on the basis of acceptance of prior years' costing is simply to ignore the plain language of the applicable regulations.

Finally, the plaintiff argues that none of the institutions chosen by the Hearing Officer for comparison purposes had distinct parts and therefore were not similar in scope of services or utilization. Accordingly, it claims that these institutions' average per diem cost of $19.59 was an invalid reference point and any comparison between its costs and the others was improper. We do not agree.

Plaintiff does not contend that the other institutions failed to provide good, adequate, or complete services to Medicare patients. It only maintains that, by reason of its distinct part operation, the allegedly higher quality of its care and services made it distinguishable and beyond comparison and entitled it to reimbursement of its actual costs although they were more than five times the average cost of other providers in the area. Since the purpose of the comparison is to determine fair compensation for services rendered to Medicare beneficiaries, we agree with the Hearing Officer, that, whether the providers operated with one or two parts is immaterial, so long as they meet Medicare standards and provide essentially the same needed health care. The Hearing Officer was correct in holding that:

[T]he determination of reasonable costs is largely a matter of comparison of one provider's costs with those of majority of providers operating in similar circumstances. To claim that one provider's voluntary action, in this case, creation of two distinct parts, rescinds comparability, and thereby negates the constraints of reasonable costs principle applicable to all providers of services, is neither acceptable nor logical.

Since the services provided by the plaintiff are substantially similar to those rendered by other providers chosen for comparison by the Hearing Officer, we find that they are comparable to the plaintiff in size, scope of services, location and utilization. As such, we must agree with the Hearing Officer that the plaintiff's 1971 per diem costs of $102.-53 is substantially out of line with the other institutions' average costs of $19.-59, and, accordingly, the Hearing Officer was justified in disallowing full repayment of plaintiff's actual costs. The final per diem allowance of $69.58 represents approximately 3½ times the average paid to like institutions and is a more than generous reimbursement.

In summary, we find that the plaintiff could and should have opted for one level of care prior to the 1971 calendar year, and that the Medicare program does not require that it be reimbursed for unreasonable costs resulting from an unwise business decision. We find that the $69.58 actually paid to the plaintiff is both equitable and fair, and represents a generous reimbursement to plaintiff compared to the payments made to similar institutions. Finally, we find that the Hearing Officer's decision is amply supported by the record and does not constitute arbitrary or capricious action. An order consistent with the foregoing will enter.